## 23829. GIBSON *v.* GIBSON.

DECIDED JANUARY 11, 1935.

*B. J. Stevens,* for plaintiff in error.
*J. B. & T. R. Burnside, Randall Evans Jr.,* contra.

MacINTYRE, J. Dr. William A. Gibson died on February 27, 1933. Appraisers set apart his entire estate as a year's support for his wife and their minor child; and John Gibson, a brother of the deceased, filed his caveat to the return of the appraisers, upon the following grounds: (1) "That the estate . . is indebted to your caveator in the sum of approximately $1,500, and as such creditor this caveator presents these objections to the return of the appraisers." (2) "The property and money set aside . . is far in excess of the property and money necessary for the support and maintenance of . . . Mrs. Gibson and her minor child . ." (3) Instead of the value of the property and money set aside as a year's support being worth $10,025.97, the valuation put upon it by the appraisers, it was actually worth approximately $25,000; and the appraisers did not take into consideration the fact that the estate was in debt. (4) "That said appraisers . . set aside as a year's support . . all of the estate . . , and if said excessive return . . is made the judgment of the court your petitioner will be entirely defeated in reference to his collection of $1,500 from said estate. That there is no plat of said

land by appraisers." By agreement, the case was appealed to the superior court; the jury returned a verdict upholding the return of the appraisers; the caveator's motion for a new trial was overruled and he excepted.

"Only heirs, their privies, and creditors may contest with a widow and minor children their right to a year's support out of the estate of the deceased husband and father." *Jones* v. *Cooner,* 137 *Ga.* 681, 683 (74 S. E. 51). The burden of proof was of course upon the caveator. *Lee* v. *English,* 107 *Ga.* 152 (33 S. E. 39). He was proceeding solely upon the ground that he was a creditor of the estate, and if this were not shown he would have no right to object and the case would be at an end.

John Gibson was the overseer on a large farm owned by the deceased, who will be hereinafter referred to as "Dr. Will Gibson." Dr. Charles Gibson, a brother of John Gibson and of Dr. Will Gibson, sworn for the caveator, testified in part as follows: "John was trying to get money from the government. I asked Will why he did not let John have the money himself. He said he owed John money, but if he let him have it he would spend it. He said five or six or seven hundred dollars." On cross-examination Dr. Charles Gibson testified in part: "He said he owed John five or six hundred dollars. I might have told Mr. Stevens that he said five or six or seven hundred dollars. Dr. Gibson said five or six hundred dollars. I can't explain why I told Mr. Stevens it was five, six, or seven hundred. He said he owed him that money for labor. That was about a week before Dr. Gibson died. It was on Friday night before he died on Sunday of the following week. I don't undertake to say that the money was not paid before Dr. Gibson died. . . I don't know how much labor he has performed for Dr. Gibson. Dr. Gibson did not say whether it was for labor or salary; he just said he owed John the money. I don't know what he owed him for. . . I don't know what John Gibson cost Dr. Gibson; I don't know anything at all about it."

Mrs. R. T. Allen, a sister of John Gibson and of Dr. Will Gibson, sworn for the caveator, testified in part; "I was in Dr. Gibson's office some time last summer . . and he was talking about John, and asked me how he was getting along, and said something about he was not paying John very much, that he was going to have a settlement and pay him in full. He said John did not take much

to live on." On cross-examination Mrs. Allen testified in part: "He said at that time that he was paying him $14 a month, and he was going to pay him in full. He said he was just paying him enough to get by on. He said that was not his salary, but he was letting him have that much. I knew it was hard to get along on $14. So far as I know, John was getting along all right. I don't know whether John owed Dr. Gibson anything; he did not say anything about that. . . John had some land down there. He was on Dr. Gibson's place. If he got by at all, it was through Dr. Gibson having him there, I suppose. He farmed for him and worked for him." Virgil Snyder, a brother-in-law of John Gibson and of Dr. Will Gibson, sworn for the caveator, testified that the following occurred in a conversation between witness and Dr. Will Gibson on July 4, 1932: "Dr. Gibson said he was paying John barely enough to live on. He said he had bought cottonseed from him and had not paid him. He said he hoped to make enough money to pay him." On cross-examination this witness testified: "I don't know whether John was drawing checks on him all the time. I don't know whether Dr. Gibson was in fact giving him $100 a month to keep him up. . . He did not say how much he was paying him; it was his business." Mrs. R. T. Allen, recalled by the caveator, testified in part: "John's wife had a little money. As to whether Dr. Gibson contributed anything to the Gibsons down there in the way of support, I think he came to see them when they were sick and let him know. As for money, I don't think I could say that he ever gave them any money. When they were sick he attended them without charge."

E. H. McCord, sworn for the defendant, testified in part: "I had a conversation with Dr. Gibson during the year before his death; I had a conversation with him the last of November or the first of December. He said it took all he made to keep that farm up. I asked him why he didn't turn it loose, and he said he kept that for John. He said he kept the farm to keep John from starving to death. He said John kept ahead of him. I reckon he must have kept ahead of his wages if he owed him anything. . . I am not related to either side of this case. . . So far as I know, Dr. Gibson paid his debts. I never heard anybody say he owed them anything." Mat Hayes, sworn for the defendant, testified in part: "Dr. Gibson and John purchased supplies for the farm

at my store. They bought a whole lot. Dr. Will Gibson paid for them. . . Dr. Will Gibson was at the store about the first of December of last year. He said that John and his family were about to break him and was about to run him crazy. I says: 'Doc, why don't you sell it or give it away?' He says: 'I can't do it; I have got to do something to take care of John, I don't think he could make a living.' . . His bills run anywhere from $25 to $50 a month, and sometimes more than that. They would consist of flour and meat, just something to eat. . . He did not tell me that John owed him anything. He did not say that he owed John anything." Mrs. Mae Gibson, sworn for the defendant, testified in part: "In 1929, when Dr. Gibson was sick, I begged him to give up the farm, and he said that if he did he did not know what would become of John. . . He did not make any statement that he . . owed John anything. . . I asked Dr. Will a week before he died if he was going to farm, and he said not."

It appears from the record that during the years 1931 and 1932 numerous checks signed "W. A. Gibson, per John Gibson" were given to various parties; also that during the same time and as late as August 28, 1932, Dr. W. A. Gibson signed thirteen checks ranging in amounts from $40.02 to $100, and payable to John Gibson.

When, how, or in what amount of money Dr. Will Gibson became indebted to John Gibson does not clearly appear from the evidence in the case. It is true that the evidence for the defendant in error was about as uncertain and inconclusive as that for the caveator, but it must be kept in mind that the burden rested upon the latter to show that he was a creditor of the estate. The witness McCord testified in substance that Dr. Will Gibson told him, about three months before his death, that "it took all he made to keep that farm up," but that he "kept the farm to keep John from starving to death," and that "*John kept ahead of him.*" While John testified in effect that none of the checks introduced in evidence was for his benefit, yet it does appear that thirteen of those checks were payable to John Gibson, while others were payable to third persons, and, under the peculiar circumstances of the case, the jury may have deemed this fact of some significance. In short, we think that the jury had the right to conclude from the evidence as a whole that the estate of Dr. Will Gibson was not indebted to John

Gibson in any amount. If this conclusion is correct, John Gibson had no right to intervene, and it is not necessary to consider the other grounds of the caveat. We therefore hold that the court did not err in overruling the general grounds of the motion for a new trial.

In the first special ground it is contended that the court erred in allowing the witness Mat Hayes, when asked what was approximately the amount of bills Dr. Will Gibson and John Gibson made every month for Dr. Gibson's farm, to answer as follows: "His bills run anywhere from $25 to $50 per month, and sometimes more than that. They would consist of flour, meat, just something to eat. John carried some of it away, but Dr. Gibson most of the time." The objection was that what bills Dr. Gibson paid to run his farm "shed no light on any issue in the case." There being evidence tending to show that Dr. Will Gibson was running his farm at a loss in order to take care of his brother John, we decline to reverse the judgment because of the admission of this testimony.

The second special ground avers that when, in admitting the foregoing testimony of Mat Hayes, the court said that "it would be a circumstance for the jury to consider along with all the other evidence in the case in determining the manner of living the doctor usually lived in, and also as to whether or not he is indebted to John Gibson," the court intimated that "if Mat Hayes was furnishing to the farm of Dr. Will Gibson supplies to run that farm . . , that fact would show and determine the manner of living that the doctor usually lived in, and that the supplies furnished the farm, which farm the evidence shows John Gibson was merely the manager of, would determine, if the supplies were furnished, that the estate of Will Gibson owed John Gibson nothing." We hold that the ground is not meritorious.

The third special ground avers that the court erred in allowing Mrs. Mae Gibson to testify that when Dr. Will Gibson was sick in 1929 and she begged him to give up the farm, "he said if he did he did not know what would become of John." The objection was that the statement of Dr. Gibson was made "too far back to shed any light on any issue in the case." There being no testimony as to when any alleged indebtedness of Dr. Will Gibson to John Gibson was incurred or became due, we do not think that the evidence was inadmissible for the reason assigned. Moreover, the assign-

ment is not meritorious for the reason that it appears that the evidence was admitted by the court with the statement: ".Go ahead, I will see if it is connected up;" and it does not appear that any subsequent objection was made to the evidence upon the ground that it had not been "connected up." See *Thurman* v. *State,* 14 *Ga. App.* 543 (2) (81 S. E. 796), and cit.

The fourth special ground avers that the court erred in admitting in evidence "twenty-nine checks, fifteen of which were written by John Gibson for Dr. W. A. Gibson, made payable to others than Gibson, and fourteen checks written by Dr. W. A. Gibson to John Gibson." The gist of the objection to the introduction of these checks was that they "would confuse the jury, because the jury might perhaps consider that this was a payment to John Gibson for something John had gotten from Dr. Gibson, when, as a matter of fact, John Gibson was merely the source through whom the money went for the operation of that farm." It appears from an exhibit to the ground that fifteen of these checks were signed W. A. Gibson per John Gibson, and were paid to third persons, and that thirteen were "from W. A. Gibson to John Gibson." The dates and amounts of the checks last mentioned are as follows: "April 15, 1932, for $50," "April 4, 1932, for $56," "May 16, 1932, for $53," "June 3, 1931, for $100," "March 30, 1931, for $100," "July 1, 1932, for $53," "August 1, 1932, for $53," "June 1, 1932, for $53," "July 15, 1932, for $53," "August 15, 1932, for $53," "August 28, 1932, for $50," "July 31, 1931, for $100," and "June 15, 1932, for $53." It also appears from the exhibit to the ground that one check was "from W. A. Gibson, per John Gibson, on April 2, 1932, for $40.02 to cash." Under the facts and circumstances of this case, we hold that the assignment of error is not meritorious.

The fifth special ground avers that in instructing the jury that if the caveator was not a creditor of the estate their investigation would be at an end and they should "render a verdict in favor of the return of the appraisers," the court "argumentatively informed the jury that it was admitted that Mrs. Louise Gibson and the minor child are the only heirs at law of the deceased," and expressed the opinion that "John Gibson was not a creditor of the estate." The ground states that the return of the appraisers stated that "it is admitted in this case that Mrs. Louise Gibson and her minor child are the only heirs at law of the deceased," the caveator was proceed-

ing upon the hypothesis that he was a creditor of the estate, and there was no contention by the caveator that Mrs. Gibson and her minor child were not the only heirs of the estate of Dr. Will Gibson. In these circumstances, we see no reason for reversing the judgment for the first cause assigned. Unquestionably the burden was upon the caveator to show that he was a creditor of the estate, and, while the court did emphasize this fact by repetition, we do not think it can be fairly concluded from the excerpt from the charge set out in this ground that he expressed his opinion that the caveator was not such creditor. We hold that the ground discloses no cause for reversing the judgment.

*Judgment affirmed. Broyles, C. J., and Guerry, J., concur.*